# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

| | |
|---|---|
| In the Matter of the Parental Rights to:<br><br>J.F.R. and J.T.R., minor children. | No. 86596-0-I (consolidated with No. 86597-8-I)<br><br>ORDER DENYING MOTION FOR RECONSIDERATION AND WITHDRAWING AND SUBSTITUTING OPINION |

The appellant, A.R., has filed a motion for reconsideration of the opinion filed on November 3, 2025, and the State has filed a response. The court has determined that the motion should be denied, but the opinion should be withdrawn, and a substitute opinion filed; now, therefore, it is hereby

ORDERED that the motion for reconsideration is denied; and it is further

ORDERED that the opinion filed on November 3, 2025 is withdrawn; and it is further

ORDERED that a substitute unpublished opinion shall be filed.

_Feldman, J._

_Coburn, J._          _Mann, J._

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Parental Rights to:<br><br>J.F.R. and J.T.R., minor children. | No. 86596-0-I (consolidated with No. 86597-8-I)<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

FELDMAN, J. — A.R. appeals an order terminating her parental rights to two of her children: J.T.R. and J.F.R. A.R. argues (1) the trial court erred when it found the Department of Children, Youth, and Families (Department) had offered all reasonably available necessary services to overcome the barriers to family reunification, (2) the trial court relied on inadmissible expert testimony regarding treatment for substance abuse, (3) she was deprived of her right to effective assistance of counsel when her attorney failed to object to inadmissible hearsay, (4) the trial court incorrectly characterized a witness's testimony in concluding that the Department had proved guardianship was not a viable option for J.T.R. and J.F.R., and (5) the trial court erred in finding she was unfit to parent. Because substantial evidence supports the trial court's findings and A.R. has not otherwise established an entitlement to relief, we affirm.

I

A.R. was married to J.T.R. and J.F.R.'s father, B.R., when the two children were born in 2013 and 2016, respectively. Both children were born positive for opiates and dependency cases were opened. A.R. and B.R. divorced in 2017 and their parenting plan established that J.T.R. and J.F.R. would live with B.R., which closed the dependency cases with the Department.[1] In 2018, A.R. began a relationship with J.G.

In early 2020, B.R. was incarcerated and could no longer care for J.T.R. and J.F.R. B.R. left J.T.R. and J.F.R. with A.R, who was living in motel rooms and her car. A.R. was then pregnant with her third child, and in May 2020 she gave birth to J.K.G.[2] J.K.G. tested positive for amphetamines and opiates at birth, and the family was again referred to the Department. J.K.G. left the hospital in the care of A.R.'s sister, M.K.P. In early 2021, dependency was ordered as to J.K.G.

With the Department actively involved in J.K.G.'s welfare, A.R. became concerned it would open new dependency cases as to J.T.R. and J.F.R. and concealed the fact they were living with her. When the Department learned that J.T.R. and J.F.R. were living with A.R., it opened additional dependency cases as to them because it believed A.R. continued to suffer from untreated substance abuse and significant mental health issues that posed risks to their well-being.

---

[1] B.R. relinquished his parental rights as to J.T.R. and J.F.R. by agreeing to an open adoption with their foster parents at the beginning of the termination trial.

[2] The scope of the termination proceeding initially covered A.R.'s and J.G.'s parental rights as to J.K.G, but they reached an adoption agreement with J.K.G.'s foster parents during the termination trial and thus this appeal concerns only A.R.'s parental rights to J.T.R and J.F.R.

In April 2021, a trial court established dependency as to J.T.R. and J.F.R., finding there is "no parent, guardian or custodian capable of adequately caring for the children, such that the children are in circumstances which constitute a danger of substantial damage to the children's psychological or physical development." The trial court held a contested dispositional hearing in June 2021 and A.R. was ordered to (1) undergo a drug and alcohol evaluation and complete any recommended treatment programs, (2) participate in random urinalysis testing once a week for 90 days, (3) complete a psychological evaluation with a parenting component and follow all recommended treatments stemming from that evaluation, and (4) participate in evidence-based in-home services upon reunification and follow all related recommendations. J.T.R. and J.F.R. were placed with a foster family.

A.R. secured housing approximately four months later and began to participate consistently in supervised visits with J.T.R. and J.F.R. at her new home. She did not complete the drug and alcohol evaluation ordered in J.T.R.'s and J.F.R.'s dependency cases. She started the court-ordered psychological evaluation but did not complete the components that required in-person observation to assess the parent-child relationship. A.R. also did not participate in the court-ordered urinalysis testing.

In 2024, after repeated attempts to engage A.R. in services to treat her substance abuse, the Department filed a petition to terminate A.R.'s parental rights to J.T.R. and J.F.R. The trial court held a hearing and heard testimony from several witnesses including A.R., M.K.P., the court appointed special advocate

(CASA), social workers, and a therapist who worked with A.R. At the close of evidence, the Department requested that the court grant its petition to terminate A.R.'s parental rights. The CASA likewise recommended that the trial court grant the petition. A.R., in turn, asked that the court deny the termination. The trial court rejected A.R.'s arguments, granted the Department's petition, and terminated her parental rights to J.T.R. and J.F.R. A.R. timely appeals.

II

A

Where, as here, a parent challenges a termination order, we apply a well-established "two-step framework." *In re Dependency of G.C.B.*, 28 Wn. App. 2d 157, 171, 535 P.3d 451 (2023). For the first step, the Department must prove six statutory elements by clear, cogent, and convincing evidence. *Id.* Those six elements are:

> (a) That the child has been found to be a dependent child;
>
> (b) That the court has entered a dispositional order pursuant to RCW 13.34.130;
>
> (c) That the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency;
>
> (d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;
>
> (e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future . . . .

(f) That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home. In making this determination, the court must consider the efforts taken by the department to support a guardianship and whether a guardianship is available as a permanent option for the child. . . .

RCW 13.34.180(1). Also in the first step, "due process protections require that a court make a finding of current unfitness before parental rights can be terminated." *In re Parental Rights to K.M.M.*, 186 Wn.2d 466, 479, 379 P.3d 75 (2016). The second step, not challenged here, is that the Department "must establish that termination of parental rights would be in the child's best interest by a preponderance of the evidence." RCW 13.34.190(1)(b); *G.C.B.*, 28 Wn. App. 2d at 171.

Trial courts are afforded broad discretion in termination proceedings, and their decisions are "entitled to great deference on review." *In re Dependency of J.D.P.*, 17 Wn. App. 2d 744, 755, 487 P.3d 960 (2021). We review the court's findings for substantial evidence. *In re Dependency of A.M.F.*, 23 Wn. App. 2d 135, 141, 514 P.3d 755 (2022). We affirm findings as to RCW 13.34.180(1)'s statutory elements where "the ultimate fact at issue is shown to be 'highly probable.'" *J.D.P.*, 17 Wn. App. 2d at 754 (quoting *In re Welfare of Sego*, 82 Wn.2d 736, 739, 513 P.2d 831 (1973)). In performing this analysis, we do not reweigh evidence or reassess the credibility of witnesses, and "we view the evidence and reasonable inferences drawn from it in the light most favorable to the prevailing party." *A.M.F.*, 23 Wn. App. 2d at 141. Here, the prevailing party is the Department. Lastly, where findings are unchallenged, they are verities on appeal. *In re Dependency of A.N.C.*, 24 Wn. App. 2d 408, 416, 520 P.3d 500 (2022).

B

A.R. does not contest that RCW 13.34.180(1)(a)-(c) have been proven. Instead, She asserts four arguments that, to varying degrees, relate to RCW 13.34.180(1)(d)-(f). We address each in turn.

1

A.R. argues the trial court erred when it found the Department had offered all reasonably available necessary services to overcome the barriers to family reunification. We disagree.

RCW 13.34.180(1)(d), quoted in full above, requires that the Department prove it has offered or provided necessary and reasonably available services capable of correcting the parental deficiencies within the foreseeable future. "A service is necessary within the meaning of the statute if it is needed to address a condition that precludes reunification of the parent and child." *In re Dependency of A.M.M.*, 182 Wn. App. 776, 793, 332 P.3d 500 (2014). According to A.R., the record establishes that the Department failed to offer housing services when she was unhoused. This, she claims, establishes that RCW 13.34.180(1)(d) is not satisfied here.

A.R.'s argument fails because the condition that precluded reunification with J.T.R. and J.F.R. was her substance abuse, not the lack of housing she experienced for the first few months of the dependency case. Kim Cornell, a social worker, testified at trial, "the primary barrier [to reunification] would have been and continues to be just the reluctance to do [services regarding substance abuse]. I have heard from [A.R.], that [she] didn't believe a dependency should . . . exist,

didn't believe that [she] had parental deficiencies, didn't believe that . . . any of the services that were ordered . . . would remedy anything." CASA Jennifer Reitz confirmed the basis of her recommendation to terminate parental rights was related to A.R.'s substance abuse, not A.R.'s initial lack of housing, as follows:

> Q. So you described a lot of positives about [A.R.] . . . in this trial. Based on your investigation do you have concerns about [A.R.'s] parenting abilities and keeping the children safe?
>
> A. I'm concerned about potential substance use. While [A.R. has] verbally expressed [herself] very clearly that [she does not] think that the state has any right to take UAs, it's my opinion as a CASA that that's a clear way to demonstrate that you in fact do not have a substance use problem and, you know, are ready to safely and permanently parent your kids. And I can't help but be suspicious that if a parent is not engaged in that activity over a 3-year period of time that . . . there's still a lingering issue. And I believe with that pattern of behavior come[s] a lot of inherent safety risks for the children.
>
> I also feel like it lends itself to instability in the household and I feel like in the case of [J.T.R.] and [J.F.R.][,] [t]hey are boys that especially need stability and structure in their lives to thrive.
>
> And so for those reasons I have made the recommendation[] [to terminate A.R.'s parental rights that] I did on my report.

A.R. points to nothing in the record indicating the Department considered A.R.'s prior lack of stable housing to be the barrier to reunification.

Moreover, assuming A.R.'s housing was a barrier to reunification at the outset of the case, A.R. moved into stable housing four months into the years-long dependency and remained housed for the duration of the case. CASA Reitz testified as to A.R.'s continuous and stable housing, commenting that it *benefited* the family as it allowed A.R. to complete supervised parent-child visits as soon as she secured it:

> [Visitation] was definitely not happening as frequently and it was not happening as reliably [prior to becoming housed in 2021] . . . [visitation] was pretty much not possible until it was happening at [her] current house. Since [supervised visits have] been at [A.R.'s] current house and they've had a visit supervisor to bring the children it's been happening very reliably.

The record also indicates that A.R.'s social worker discussed housing support while A.R. was unhoused at the beginning of the case and learned that A.R. was already aware of available housing support and was already receiving housing assistance. As the record here shows, lack of housing was not an actual barrier to reunification.

In sum, substantial evidence supports the trial court's finding that the Department offered all necessary and reasonably available services to address the substance abuse that served as the barrier to reunification. A.R.'s contrary arguments are unavailing.

2

A.R. argues the trial court erred in relying on inadmissible expert testimony regarding treatment for substance abuse. We reject this argument.

Social work supervisor Megan Stampfli testified at the termination trial and was certified as a qualified expert in "child welfare, social work, and permanency." Regarding A.R.'s lack of participation in court-ordered services to address her substance abuse, the Department's attorney asked Stampfli, "[i]f a parent had substance dependence to the degree that they were recommended [for] inpatient treatment, how difficult would it be for them to resolve that parenting deficiency by

themselves?"[3] Defense counsel objected as to foundation, and the trial court responded, "[Stampfli has] been qualified as an expert on this matter and it goes to cred[ibi]lity so I'm going to overrule the objection." Stampfli continued, "it is very difficult to become sober if you have been recommended inpatient treatment and you don't do inpatient treatment."

The trial court referenced Stampfli's testimony in its findings relating to RCW 13.34.180(1)(e), which is quoted above. The court found:

c. Speaking to the potential for [A.R.] to remedy her parental deficiencies without engaging in services, Supervisor [Amy] Holmes[4] testified that:

i. Most parents often need support of formalize[d] services in order to make the significant changes necessary to become safe parents, it is very rare to see such changes without engaging in services.

1. Supervisor Stampfli later testified to the same, that it would be very unlikely parents could remedy parental deficiencies without engaging in services, and she has never seen this happen.

2. Supervisor Stampfli further testified that if a parent were to be recommended inpatient treatment, based on her experience, it would be incredibly difficult for them to address their substance use by themselves.

As A.R. explains in her reply brief, "this is not a substantial evidence challenge, it is about whether improper expert testimony was admitted and whether it affected the outcome of the proceedings." We therefore limit our analysis to those two issues.

---

[3] A.R. completed an evaluation recommending a 30-day inpatient treatment as part of J.K.G.'s dependency in 2020, but did not follow the recommendation. A.R. did not complete the drug and alcohol evaluation ordered in J.T.R.'s and J.F.R.'s dependency cases.
[4] Department social work supervisor Holmes' qualifications are not challenged by A.R.

Under ER 702, "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Furthermore, an expert may be qualified by experience alone. *Id*. An expert may not, however, "testify about information outside [their] area of expertise." *Katare v. Katare*, 175 Wn.2d 23, 38, 283 P.3d 546 (2012). "The trial court has broad discretion in determining whether an expert's testimony is admissible under ER 702." *In re Det. of McGary*, 175 Wn. App. 328, 339, 306 P.3d 1005 (2013). "The exercise of such discretion will not be disturbed by an appellate court except for a very plain abuse thereof." *Katare*, 175 Wn.2d at 38 (internal quotation marks omitted). We "will not disturb the trial court's ruling if the reasons for admitting or excluding the opinion evidence are both fairly debatable." *Miller v. Likins*, 109 Wn. App. 140, 147, 34 P.3d 835 (2001) (internal quotation marks omitted).

Contrary to A.R.'s argument, Stampfli was sufficiently qualified to testify as an expert on substance abuse recovery. Stampfli holds a bachelor's degree in psychology and a master's degree in social work. In addition, she completed core academy social work training, which included substance abuse training in both Colorado and Washington, and participates in ongoing annual training as a social work supervisor. Stampfli worked for over a decade as a social worker in Colorado and Washington before being promoted to supervisor. She then supervised and managed hundreds of cases for the Department in Washington. Considering her experience, training, and education, the trial court had tenable grounds to conclude

that Stampfli was sufficiently qualified to testify as to A.R.'s likelihood of overcoming substance abuse without participating in treatment and that her testimony would be helpful to determining whether there is a likelihood that conditions will be remedied so that J.T.R. and J.F.R. could be returned to A.R. in the near future. Additionally, the court's findings indicate that it also relied on similar testimony by Holmes, which is unchallenged here. On this record, A.R. has not established reversible error.

3

A.R. next raises two arguments that relate to the efforts taken by the Department to support a guardianship and whether a guardianship is available as a permanent option. Such findings are required by RCW 13.34.180(1)(f), which is quoted above. We disagree with both arguments.

a

First, A.R. argues she was deprived of her right to effective assistance of counsel when her attorney failed to object to inadmissible hearsay relating to the foster parents' disinterest in guardianship. To establish ineffective assistance of counsel, a party must show deficient performance and resulting prejudice. *In re Dependency of S.M.H.,* 128 Wn. App. 45, 61, 115 P.3d 990 (2005).

"Counsel's performance is deficient if it falls 'below an objective standard of reasonableness based on consideration of all of the circumstances.'" *Id*. at 61 (quoting *State v. Thomas,* 109 Wn.2d 222, 226, 743 P.2d 816 (1987)). "To satisfy the prejudice prong, a party must show a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been

different.'" *Id.* (quoting *Strickland v. Washington,* 466 U.S. 668, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)). "Scrutiny of counsel's performance is highly deferential and courts will indulge in a strong presumption of reasonableness." *Thomas*, 109 Wn.2d at 226.

Turning to the alleged deficiency of counsel, A.R. claims her lawyer failed to object to inadmissible hearsay during the testimony of social worker Cornell, who testified at the termination trial regarding permanency options for J.T.R. and J.F.R. After establishing that the children were in "pre-adoptive homes," the Department asked Cornell, "[h]as the department discussed guardianship [of J.T.R. and J.F.R.] with these proposed adoptive parents?" Cornell responded, "Yes." The Department continued, "What is their interest in adoption versus guardianship?" and Cornell continued, "None of the foster parents are interested in guardianship." A.R.'s counsel did not object to this line of questioning. This failure to object, according to A.R., was both constitutionally deficient and prejudicial.

Even if we assume (without deciding) that A.R. has established deficient performance, she has not established any resulting prejudice. The record shows that the Department considered whether a viable alternative to termination of A.R.'s parental rights existed by inquiring into the possibility of guardianship with M.K.P., discussed in greater detail below. Furthermore, A.R. does not challenge the trial court's finding that "[g]uardianship is not an available permanent plan," and

it is therefore a verity on appeal. *See A.N.C.*, 24 Wn. App. 2d at 416.[5] Thus, A.R. cannot show—as she must—that the outcome of the trial would have been different had her attorney objected on hearsay grounds to the above-referenced testimony.

For similar reasons, A.R.'s reliance on *In re Welfare of J.M.*, 130 Wn. App. 912, 125 P.3d 245 (2005), is misplaced. In *J.M.*, the attorney who represented a mother facing termination allowed the State to present evidence from several witnesses through their written reports, which were hearsay. *Id.* at 916-19. Because only two witnesses testified live—the social worker and guardian ad litem—the vast majority of evidence was inadmissible hearsay. *Id.* This court reversed termination in *J.M.* because such representation was both constitutionally deficient and prejudicial. *Id.* at 924-25. Here, in contrast, A.R.'s attorney failed to object to a single question regarding an issue—whether the foster parents wanted to adopt J.T.R. and J.F.R.—that is not in contention. *J.M.* does not require reversal here.

b

Second, A.R. argues the trial court incorrectly characterized M.K.P.'s testimony in concluding that the Department had proved guardianship was not a viable option for J.F.R. and J.T.R. When M.K.P. was asked whether she "would . . . be willing to become [J.T.R.'s] and [J.F.R.'s] permanent guardian," she replied, "of course." A.R. claims the trial court somehow overlooked or misapprehended

---

[5] A.R. challenges only Finding of Fact (FoF) 2.16 relating to services offered by the Department and FoF 2.20 relating to A.R.'s unfitness to parent.

this testimony because its written order states, "[M.K.P] did not testify that she would be willing to be a permanent placement or a guardian." This factual error, A.R. argues, constitutes an abuse of discretion and thus requires reversal.

Although the cited portion of the order is erroneous, the record clearly shows that the trial court was not, in fact, mistaken about M.K.P.'s willingness to serve as a guardian. In its oral ruling, the trial court noted, "[M.K.P] testified . . . [she] would be willing to serve again in any capacity." Additionally, in concluding that no guardianship option was available, the trial court properly looked beyond M.K.P.'s willingness to serve as a guardian to her ability to do so in J.T.R.'s and J.F.R.'s best interests. M.K.P.'s viability to serve as a guardian to J.F.R. and J.T.R. was substantially litigated below. When J.K.G. was born positive for opiates and amphetamines, he was initially placed with M.K.P. Importantly, J.K.G. did not remain with M.K.P. because while M.K.P. was supervising one of A.R.'s visits with J.K.G., A.R. absconded with J.K.G. and kept him overnight. RP 446, 994-95. When M.K.P. discovered J.K.G. had been taken, she did not alert authorities. The removal was discovered only when a social worker came by M.K.P.'s home and J.K.G. was no longer there. J.K.G. was removed from M.K.P.'s care for this reason and placed with a foster family. This incident indicates M.K.P. was not a suitable guardian.

Numerous witnesses similarly testified at the termination trial that M.K.P. was not practicably available as a guardian to J.T.R. and J.F.R. Holmes testified M.K.P. was considered "disqualified" as a caregiver for J.T.R. and J.F.R. not only because of the incident with J.K.G., but also due to her "lack of cooperativeness

when [the Department was] trying to locate [J.T.R.] and [J.F.R.]" after J.K.G. was declared dependent and J.T.R. and J.F.R. were suspected of living with A.R. again. Reflecting on these incidents, another supervisor at the Department testified, "there's been concerns with [M.K.P.'s] ability to be protective of the children and put the children's needs first" based on her conduct in the ongoing case.

In its oral ruling, the trial court appropriately highlighted the substantial record of concerns with M.K.P. noting:

> [M.K.P.] is [A.R.'s] sister who is very close to mother and has been a caregiver for the children . . . [S]hortly after [J.K.G.'s] birth [M.K.P.] was the placement for [J.K.G.]. However this was taken away when mother came and took [J.K.G.] to show the baby to [his father, J.G.]. DCYF was alarmed about the fact that [M.K.P.] did not report this violation, and then [M.K.P.] lost her placement status.

The written order incorporated the oral ruling by reference and concluded, "Guardianship is not an available permanent plan." On this record, A.R. has not established reversible error regarding the trial court's findings as to the efforts taken by the Department to support a guardianship and whether a guardianship is available as a permanent option.

C

Finally, A.R. argues the trial court erred in finding she was currently unfit to parent. We again disagree.

Parents have a fundamental liberty interest in the custody and care of their children. *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 599 (1982). As stated above, along with finding the Department satisfied the elements of RCW 13.34.180(1), as discussed in section II.B above, due process protections

require that the trial court make a finding of current parental unfitness before it can terminate parental rights. *K.M.M.*, 186 Wn.2d at 479. The proper inquiry for parental unfitness "is whether the existing parental deficiencies, or other conditions, prevent the parent from providing for the child's basic health, welfare, and safety." *Id.* at 493.

Here, the trial court made an explicit finding of parental unfitness. It found:

The passage of time should have allowed the mother to correct her parental deficiencies; her lack of engagement in nearly four years of dependency proceedings demonstrates a failure to substantially improve her ability to safely care for her children. Instead of working to complete her services, [A.R.] chose to challenge and dispute the Department.

In addition to A.R.'s failure to make any progress against court-ordered services, the trial court noted A.R. "did not demonstrate any reflection on her own behavior and choices up until that point" and that she believed any statements by J.T.R. and J.F.R. as to their wishes to be adopted could be explained by "influence[] and manipulat[ion] by the foster parents."

Substantial evidence supports the court's finding that A.R. was currently unfit to parent J.T.R. and J.F.R. A.R. and her partner, J.G., admitted to use of unprescribed drugs and methamphetamine since her children were born. Over the course of the years-long dependency case, A.R. refused to complete the court-ordered services that would have addressed her use of substances and resultant parental deficiencies because she "do[esn't] communicate with the Department." Explaining her rationale for rejecting the services the Department offered, A.R. testified that social workers' attempts to offer her substance abuse services were ineffective because they were "not about what [services] I'd like to engage in.

[They were] about what I need to engage in." Furthermore, unchallenged expert testimony indicated that A.R.'s refusal to participate in urinalysis testing suggests she is still using. A.R.'s refusal to participate in services to determine the nature and extent of her substance use reasonably supports the conclusion that she has failed to address the issue and is currently unfit to parent.

Notwithstanding the above analysis, A.R. argues the evidence does not show she is *currently* unfit to parent J.T.R. and J.F.R. To support that argument, A.R. claims in the two years prior to the termination trial she has never presented a safety concern. To be sure, A.R.'s visits with J.T.R. and J.F.R. went well, and the trial court mentioned this in its oral ruling. But as the trial court found, "[T]here are big differences between visits and full time care. Making sure children are safe, fed, going to school[,] seeing their medical doctors, and generally being able to handle anything coming up twenty-four-seven is a much greater responsibility [than] the set time of visitation." And although A.R. completed the Positive Parenting Program in her home, she did not complete a drug and alcohol evaluation or random urinalysis testing after she was ordered to do so in 2021. Under RCW 13.34.180(1)(e), a parent's failure to substantially improve parental deficiencies within 12 months following entry of a dependency order "shall give rise to a rebuttable presumption that there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future." A.R. has not rebutted that presumption.

A.R.'s argument regarding this issue is also legally flawed. As *In re Dependency of J.C.*, 130 Wn.2d 418, 924 P.2d 21 (1996), explains:

past history is a factor that a court may consider in weighing a parent's current fitness. This position is sensible because if substance abuse is so extensive as to render a person unfit to parent and it is unlikely that the unfitness can be remedied in the near future, it makes little difference whether that abuse occurred in the past or present.

*Id.* at 428 (internal quotation marks omitted). Stated more succinctly, termination proceedings "do[] not require relitigation of the dependency determination." *In re Dependency of K.R.*, 128 Wn.2d 129, 141, 904 P.2d 1132 (1995).

Lastly, A.R. cites *In re Welfare of A.B.,* 168 Wn.2d 908, 232 P.3d 1104 (2010), in support of her argument, but that reliance is misplaced. In *A.B.*, the State argued the trial court had made an implicit finding that the father was unfit to parent. *Id.* at 922*.* The court rejected the State's argument because the father had completed services to address his adjudicated parental deficiencies, including substance abuse, and the trial court made many findings that tended to show he was not currently unfit. *Id.* at 912-24. Here, in contrast, the trial court made an explicit finding that A.R. remained unfit to parent, so we need not infer such a finding. Equally important, the father in *A.B.* completed services for his identified parental deficiency of substance use, and so that parental deficiency could not have been a reason to infer he remained unfit to parent. *Id.* at 913-16. That did not happen here. Thus, *A.B.* does not establish an entitlement to relief.

III

Because substantial evidence supports the trial court's findings and A.R. has not otherwise established an entitlement to relief, we affirm the order terminating her parental rights to J.T.R. and J.F.R.

_Feldman, J._

WE CONCUR:

_Coburn, J._                    _Mann, J._